J-S13035-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| KEITH JOHNSON | : | |
| | : | |
| Appellant | : | |
| | : | No. 1169 WDA 2015 |

Appeal from the Judgment of Sentence July 17, 2015
in the Court of Common Pleas of Fayette County Criminal Division
at No(s): CP-26-CR-0001643-2014

BEFORE: LAZARUS, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED MAY 27, 2016**

Appellant, Keith Johnson, appeals from the judgment of sentence entered in the Fayette County Court of Common Pleas following a jury trial and convictions for aggravated assault with a deadly weapon,[1] kidnapping,[2] unlawful restraint-risk of serious bodily injury,[3] unlawful restraint of a minor-risk of serious bodily injury,[4] false imprisonment,[5] false imprisonment of a

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2702(a)(4).

[2] 18 Pa.C.S. § 2901(a)(2)-(3).

[3] 18 Pa.C.S. § 2902(a)(1).

[4] 18 Pa.C.S. § 2902(b)(1).

[5] 18 Pa.C.S. § 2903(a).

minor,[6] robbery,[7] burglary,[8] criminal trespass,[9] theft by unlawful taking,[10] unauthorized use of a motor vehicle,[11] terroristic threats,[12] and conspiracy[13] to commit, *inter alia*, aggravated assault.  Appellant raises multiple issues on appeal, and we affirm.

We adopt the facts and procedural history set forth in the trial court's opinion.  ***See*** Trial Ct. Op., 9/25/15, at 3-10, 11-13.  On July 17, 2015, the court sentenced Appellant to an aggregate sentence of twenty-eight to fifty-six years' imprisonment.  On July 20, 2015, Appellant timely filed a post-sentence motion challenging the sentence and the court order for a sexual offender assessment for registration under the Sexual Offender Registration and Notification Act[14] ("SORNA"), due to his conviction for unlawful restraint of a minor.  He also claimed that ordering such an assessment in his case is unconstitutional.  Appellant did not challenge the weight of the evidence.

---

[6] 18 Pa.C.S. § 2903(b).

[7] 18 Pa.C.S. § 3701(a)(1)(ii).

[8] 18 Pa.C.S. § 3502(a)(1).

[9] 18 Pa.C.S. § 3503(a)(1)(i).

[10] 18 Pa.C.S. § 3921(a).

[11] 18 Pa.C.S. § 3928(a).

[12] 18 Pa.C.S. § 2706(a)(1).

[13] 18 Pa.C.S. § 903.

[14] 42 Pa.C.S. §§ 9799.10–9799.41.

The court denied Appellant's post-sentence motion on July 27, 2015.

On July 29, 2015, Appellant filed a notice of appeal and a non-court ordered

Pa.R.A.P. 1925(b) statement. On September 25, 2015, the court filed its

responsive Rule 1925(a) decision.

Appellant raises the following eight issues:

> 1. Did the court err in denying all of Appellant's motion for mistrial?
>
> 2. Did the court err in denying the motions for judgment of acquittal as to all charges related to the alleged minor victim as the victim of those offenses did not testify in violation of Appellant's right to confront his accuser?
>
> 3. Did the Commonwealth fail to establish that Appellant participated in any of the offenses as they did not prove Appellant's presence at the scene of the incident or corroborate that he received any of the items taken?
>
> 4. Did the court err in denying Appellant's motion for judgment of acquit[t]al as to kidnapping charges regarding Ronald and Jonathon Packroni in that they were never removed from the residence or kept in isolation?[15]
>
> 5. Did the Commonwealth fail to prove beyond a reasonable doubt the Appellant caused serious bodily injury as required by the elements of aggravated assault?
>
> 6. Did the Commonwealth fail to prove beyond a reasonable doubt that the Appellant had any unlawful contact with the minor victim since there was no physical evidence presented in the instant case?
>
> 7. Is it unconstitutional to require an Appellant to register for a lifetime when said registration requirement exceeds the statutory maximum penalty for Appellant's offense?

---

[15] Appellant has withdrawn this issue in his brief. Appellant's Brief at 20.

- 3 -

8. Is the Adam Walsh statute unconstitutional in requiring the an [sic] Appellant to register for a lifetime?

Appellant's Brief at 7-8.[16]

In support of his first issue, Appellant contends the court erred in denying his three motions for mistrial. With respect to his first motion, Appellant contends the witness intended to bias the jury against Appellant. *See* Trial Ct. Op. at 9-10 (exchange between one of the victims and Appellant in which Appellant held a gun to the victim's head and asked "do you remember this?"). He asserts the Commonwealth was not permitted to use an uncharged prior bad act to prejudice him. Appellant's Brief at 12. Appellant disagrees with the trial court's categorization of the exchange as "at most a subtle reference to a prior incident." *Id.* (quoting Trial Ct. Op. at 10).

Appellant's second motion for mistrial was in response to testimony by Misty Danko, Appellant's paramour, that their relationship "was an abusive relationship." Trial Ct. Op. at 11. Appellant classifies her testimony as a reference to a prior uncharged bad act casting him in a bad light. Appellant's Brief at 13. He points out the court had warned the prosecutor to avoid such references after his initial motion for mistrial. *Id.* Appellant

---

[16] We are disappointed the Commonwealth did not file a brief.

posits that the second witness's reference established a pattern of misconduct by the Commonwealth's witnesses.

It was also in response to his paramour's testimony that Appellant moved for a mistrial for the third time. His paramour testified that while she was incarcerated, she became aware that Appellant was also in the same jail. Trial Ct. Op. at 12-13. Appellant contends there was no reason to state he was incarcerated and her testimony was used to disparage him before the jury. He again contends this evidences a pattern of misconduct by the prosecutor and the Commonwealth's witnesses. We conclude Appellant is not entitled to relief.

In *Commonwealth v. Wright*, 961 A.2d 119 (Pa. 2008), our Supreme Court stated:

> The review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. . . . A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

*Id.* at 142 (citations and quotation marks omitted).

> An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable probability that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is so overwhelming, so that by comparison, the error is insignificant.

***Commonwealth v. Kuder***, 62 A.3d 1038, 1052 (Pa. Super. 2013) (citation omitted) (discussing harmless error standard after unconstitutional reference to defendant's right to remain silent), *appeal denied*, 114 A.3d 416 (Pa. 2015).

> Ordinarily, admission of testimony which describes, or from which the jury may infer, past criminal conduct by a defendant constitutes reversible error. However, not all such references warrant reversal. An isolated passing reference to prior criminal activity will not warrant reversal unless the record indicates that prejudice resulted from the remark. There is no *per se* rule which requires a new trial for every passing reference to prior criminal conduct. Additionally, the possible prejudicial effect of a witness' reference to prior criminal conduct by the defendant may, under certain circumstances, be removed by a cautionary instruction.

***Commonwealth v. Maute***, 485 A.2d 1138, 1143 (Pa. Super. 1984) (citations omitted); ***accord Commonwealth v. Fletcher***, 41 A.3d 892, 895 (Pa. Super. 2012).

> We will not invalidate a trial court's decision to admit evidence absent an abuse of discretion. In general, evidence of uncharged crimes and prior bad acts is inadmissible to demonstrate a defendant's propensity to commit the crime charged. Our Supreme Court has stated that
>
> > The Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts. There are, of course, important exceptions to the rule where the prior criminal acts are so closely related to the crime charged that they show, inter alia, motive, intent, malice, identity, or a common scheme, plan or design.

***Commonwealth v. Stafford***, 749 A.2d 489, 495 (Pa. Super. 2000) (citations omitted).

Instantly, assuming that the court erred, we examine whether the "uncontradicted evidence of guilt[, *i.e.*, evidence exclusive of the instant disputed testimony,] is so overwhelming, so that by comparison," the errors are insignificant. ***See Kuder***, 62 A.3d at 1052. In this case, all of the adult victims testified, each of whom identified Appellant as the culprit. ***See, e.g.***, N.T., 7/6-7/8/15, at 28, 118, 160. Appellant's paramour—who was also present during the crimes—also inculpated Appellant. ***See, e.g.***, *id.* at 239-42. After a careful review of the entire record, the uncontradicted evidence at trial—including the victims' testimony and surveillance footage—identifying Appellant as the perpetrator is so overwhelming as to render any alleged errors insignificant by comparison. ***See Kuder***, 62 A.3d at 1052.

For background regarding Appellant's second issue, we reproduce the following exchange during the testimony by the minor victim's father:

> [Assistant district attorney]. And can you tell the members of the jury what impact this encounter has had on [the minor victim] if any?
>
> [Appellant's counsel]: Objection. He can't editorialize as to what goes on with [the minor victim]. If he's going to be a [sic] alleged victim in the case, [the minor victim] will have to come testify.
>
> [Assistant district attorney]: Your Honor, he is [the minor victim's] father. [The minor victim] is obviously a minor child, he can testify as to what happened---

[Appellant's counsel]: Your Honor---

The court: I don't want him to speculate as far as any kind of medical diagnosis or anything like that.

[Assistant district attorney]: We're not asking him to testify to medical diagnosis.

[Appellant's counsel]: Your Honor, he can't---

[Assistant district attorney]: Your Honor, we can certainly hear testimony as to the effect that he has observed from his son.

[Appellant's counsel]: Your Honor, he's not telepathic, he has no powers of mind control, he can't place himself and state what his son feels.  I object.

The court: Overruled.  You can answer.

[Father]. My son has repeatedly stated---

[Appellant's counsel]: Hearsay.

The court: Overruled.

A. ---stated to me directly that he is going to hurt the bad guys that hurt his dad.

[Appellant's counsel]: Same objection, Your Honor.

The court: It's overruled.  Go ahead and finish.

A.  And he is [sic] repeatedly and repeatedly has said this and it's been a year over a year and a half and just recently he's brought it back again.  My son, I've tried everything and tried to have nobody talk about it in front of him the situation to keep it away from him, I told his mother please do not bring this up to him because I don't want him to have this on his mind but he has repeatedly over the year and a half has told me he's gonna get a gun and protect his dad from the bad guys that hurt his father.

[Appellant's counsel]: Same objection, Your Honor.

The court: Overruled.

N.T. Trial at 113-14.

Appellant complains that the court permitted the minor victim's father to testify as to one statement by the minor victim, as set forth above. Appellant's Brief at 17. Appellant also argues the court should have granted his motion for judgment of acquittal for the crimes involving the minor victim, as he could not confront his minor accuser. *Id.* at 16. He concedes that the other "victim/witnesses" could testify about the impact of the actions he and his co-conspirators had on the minor victim. *Id.* But Appellant maintains that "their perceptions cannot be attributed to the minor victim." *Id.* In Appellant's view, the violation of his right to cross-examine the minor victim is self-evident and the court should have vacated the judgment of sentence for any conviction involving the minor victim. *Id.* at 17.

As noted above, the Commonwealth did not file an appellate brief. The trial court, however, opined that Appellant's right to confront the witnesses against him was not violated because "the allegations against Appellant regarding the minor victim did not come from the minor victim." Trial Ct. Op. at 14. The court observed that "the allegations came from the other victims who all testified at trial [on] their observations of what happened that night with respect to the minor victim," and Appellant cross-examined those other victims. *Id.* With respect to the minor victim's sole

statement, the trial court opined that the statement did not implicate Appellant. *Id.* We hold Appellant is due no relief.

Initially, we note that other than a reference to the Confrontation Clause in the United States and Pennsylvania Constitutions, Appellant's two-page argument is devoid of any legal citation and argument. *See* Appellant's Brief at 16-17. Thus, we find it waived. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (holding, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (citations omitted)).

In any event,

> whether a defendant has been denied his right to confront a witness under the Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, is a question of law, for which our standard of review is *de novo* and our scope of review is plenary.

*In re N.C.*, 105 A.3d 1199, 1210 (Pa. 2014) (citations omitted).[17]

---

[17] "[T]he text of the Pennsylvania Constitution guaranteeing accused persons the right to confront the witnesses against them was made identical to the text of the Confrontation Clause in the Sixth Amendment to the United States Constitution. Specifically, the accused has the right 'to be confronted with the witnesses against him.'" *Commonwealth v. Williams*, 84 A.3d 680, 682 n.2 (Pa. 2014). "Accordingly, our Confrontation Clause analysis in the present case would be the same under both the United States Constitution and the Pennsylvania Constitution." *See In re N.C.*, 105 A.3d at 1210 n.15.

> The Confrontation Clause of the Sixth Amendment, made applicable to the States *via* the Fourteenth Amendment, provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the **witnesses** against him . . . . In *Crawford* [*v. Washington*, 541 U.S. 36, 51 (2004)], the Court held that the Sixth Amendment guarantees a defendant's right to **confront those who bear testimony** against him, and defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact."

*Commonwealth v. Yohe*, 79 A.3d 520, 544 (Pa. 2013) (citation, brackets, footnote, and some quotation marks omitted).

The *Crawford* Court explained that the Confrontation Clause applies to witnesses against the accused. *Crawford*, 541 U.S. at 51 (citation omitted). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* The Confrontation Clause also bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. It necessarily follows that the Confrontation Clause is not triggered when (1) a witness does not testify or (2) the prosecution does not present a testimonial statement, *i.e.*, "a solemn declaration or affirmation made for the purpose of establishing or proving some fact," by an unavailable witness. *Id.* at 51, 53-54, 59; *Yohe*, 79 A.3d at 544.

Instantly, the minor victim did not testify. The Commonwealth introduced no testimonial statement by the minor victim. The minor victim's statement, as recounted by his father, was not made under oath for the purpose of establishing a particular fact. *See Yohe*, 79 A.3d at 544. In fact, the only out-of-court testimonial statement introduced by the Commonwealth was by Ms. Danko, who also testified at trial. N.T. Trial at 288. Because the minor victim was not a trial witness and did not proffer any testimony, the Confrontation Clause is not implicated. *See Crawford*, 541 U.S. at 51; *Yohe*, 79 A.3d at 544. Appellant, under these circumstances, has no right to confront the minor victim. *See Crawford*, 541 U.S. at 51; *Yohe*, 79 A.3d at 544. Thus, even if Appellant did not waive the issue, we would have concluded it lacked merit. *See In re N.C.*, 105 A.3d at 1120.

For his third claim, Appellant challenged the sufficiency of evidence for all of his convictions. He argues that the Commonwealth never established he received or possessed any of the stolen items. Appellant's Brief at 18. Appellant, however, has not cited or analyzed any law whatsoever. *See id.* at 18-19. Accordingly, he has waived the issue. *See Johnson*, 985 A.2d at 924.

In support of his fifth[18] issue, Appellant challenges whether the Commonwealth met its burden that he caused "serious bodily injury" for his aggravated assault conviction. Appellant's Brief at 21. He acknowledges that all of the victims "claimed substantial pain and blood loss" but "none of them sought medical treatment." *Id.* Appellant also underscores the lack of, in his view, other corroborative evidence. *Id.* at 21-22. He therefore requests a new trial.[19] *Id.* at 22. We conclude Appellant is due no relief.

The standard of review for a challenge to the sufficiency of evidence is *de novo*, as it is a question of law. *Commonwealth v. Ratsamy*, 934 A.2d 1233, 1235 (Pa. 2007).

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the

---

[18] As noted above, Appellant withdrew his fourth issue from consideration by this Court. *See* Appellant's Brief at 20.

[19] We note the following:

> A claim challenging the sufficiency of the evidence, if granted, would preclude retrial under the double jeopardy provisions of the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Pennsylvania Constitution, *Tibbs v. Florida*, 457 U.S. 31, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982); *Commonwealth v. Vogel*, 501 Pa. 314, 461 A.2d 604 (1983), whereas a claim challenging the weight of the evidence if granted would permit a second trial. *Id.*

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

> evidence believed by the fact-finder was sufficient to support the verdict.

> * * *

> When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt.

*Id.* at 1235-36, 1237 (citations and some punctuation omitted).

In contrast to a sufficiency claim, a challenge to the credibility of a witness is a weight claim. ***Commonwealth v. Paquette***, 301 A.2d 837, 841 (Pa. 1973). Such a claim must be raised before the trial court first or it is waived on appeal. ***Commonwealth v. Sherwood***, 982 A.2d 483, 494 (Pa. 2009); ***see also*** Pa.R.Crim.P. 607(A).

Pennsylvania law defines aggravated assault, in relevant part, as follows:

> **(a) Offense defined.—**A person is guilty of aggravated assault if he:

> * * *

> (4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon;

18 Pa.C.S. § 2702(a)(4).

Instantly, Appellant's claim—that the witnesses were not credible given the absence of corroborative evidence—is more fairly described as a challenge to the weight of the evidence. ***See Paquette***, 301 A.2d at 841.

Indeed, Appellant requested a new trial, and such relief is barred by a successful challenge to the sufficiency of evidence. ***See Widmer***, 744 A.2d at 751. Because Appellant did not challenge the weight of the evidence before the trial court, he has waived it on appeal. ***See*** Pa.R.Crim.P. 607(A); ***Sherwood***, 982 A.2d at 494. Regardless, construing Appellant's claim as a sufficiency challenge, after reviewing the record in the light most favorable to the Commonwealth, we easily conclude that the evidence established that Appellant and his cohorts struck the victims with firearms causing bodily harm. ***See, e.g.***, N.T. Trial, 7/6-7/7/15, at 157-60. Contrary to Appellant's argument, ***see*** Appellant's Brief at 21, the Commonwealth was not required to establish "serious" bodily harm. ***See*** 18 Pa.C.S. § 2702(a)(4).

For Appellant's sixth claim, he argues that the evidence was insufficient to sustain his convictions for unlawful restraint of a minor. ***See*** Appellant's Brief at 23-24. Appellant, however, failed to cite or analyze any law whatsoever, ***see id.***, and has thus waived the issue on appeal. ***See Johnson***, 985 A.2d at 924.

We summarize Appellant's arguments for his seventh and eighth issues. For his seventh issue, Appellant underscores the absence of any sexual offenses against the minor victim. He asserts that his convictions for unlawful restraint of a minor and false imprisonment of a minor are Tier III

sexual offenses under SORNA.[20] He contends the purpose of SORNA is to ensure sexual offenders are registered and instantly, there were no sexual offenses. Appellant points out that the Sexual Offenders Assessment Board did not find him to be a sexually violent predator. He opines that (1) SORNA is unconstitutional, and (2) lifetime registration under SORNA is cruel and unusual punishment, illegal, and also unconstitutional. In support of his eighth issue, Appellant also contends SORNA's lifetime registration requirement is unconstitutional. Appellant apparently challenges SORNA as it applies to him, as well as on its face.[21] We hold he is due no relief.

The standard of review follows:

> Because statutory interpretation is a question of law, our standard of review is *de novo*, and our scope of review is plenary.
>
> > The object of interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly. When the words of a statute are clear and free from all ambiguity, their plain language is generally the best indication of legislative intent. A reviewing court should resort to other considerations to determine legislative intent

---

[20] Appellant is partially correct. Appellant's conviction for unlawful restraint of a minor-risk of serious bodily injury, 18 Pa.C.S. § 2902(b)(1), is a Tier I sexual offense. 42 Pa.C.S. § 9799.14(b)(1) (citing 18 Pa.C.S. § 2902(b)). Similarly, his conviction for false imprisonment of a minor, 18 Pa.C.S. § 2903(b), is also a Tier I sexual offense. 42 Pa.C.S. § 9799.14(b) (citing 18 Pa.C.S. § 2903(b)). A Tier III sexual offense is defined as, *inter alia*, including two or more Tier I convictions. 42 Pa.C.S. § 9799.14(d)(16).

[21] For his eighth issue, Appellant's constitutional challenge spans a scant one-and-a-half pages in his appellate brief.

only when the words of the statute are not explicit. In ascertaining legislative intent, this Court is guided by, among other things, the primary purpose of the statute, . . . , and the consequences of a particular interpretation.

*Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 953 (Pa. Super. 2011) (citations omitted), *aff'd*, 106 A.3d 656 (Pa. 2014).

The standard of review follows:

A statute will not be found unconstitutional unless it clearly, palpably, and plainly violates the Constitution. If there is any doubt as to whether a challenger has met this high burden, then we will resolve that doubt in favor of the statute's constitutionality. The constitutionality of a statute presents a question of law for which our standard of review is *de novo* and our scope of review is plenary.

*Commonwealth v. Veon*, 109 A.3d 754, 763 (Pa. Super. 2015) (internal quotation marks, brackets, and citations omitted), *appeal granted in part*, 121 A.3d 954 (Pa. 2015). A facial constitutional challenge to a statute is waived if the challenger fails to notify the Pennsylvania Attorney General. *See* Pa.R.A.P. 521; *Kepple v. Fairman Drilling Co.*, 615 A.2d 1298, 1303 (Pa. 1992) (holding appellant waived facial constitutional challenge to statute by failing to notify attorney general under Rule 521).

A defendant convicted of a "sexually violent offense" is required to register with the police under SORNA. 42 Pa.C.S. § 9799.13. A "sexually violent offense" is defined as "An offense specified in section 9799.14 (relating to sexual offenses and tier system) as a Tier I, Tier II or Tier III sexual offense." 42 Pa.C.S. § 9799.12. Unlawful restraint of a minor and

false imprisonment of a minor are defined as Tier I sexual offenses. 42 Pa.C.S. § 9799.14(b)(1)-(2). Two or more convictions of a Tier I sexual offense is considered a Tier III sexual offense. 42 Pa.C.S. § 9799.14(d)(16).

In **Commonwealth v. McDonough**, 96 A.3d 1067 (Pa. Super. 2014), *appeal denied*, 108 A.3d 34 (Pa. 2015), the defendant, who was not classified as a sexually violent predator, argued SORNA was "unconstitutional and illegal to require an individual to register as a sex offender for 15 years for a crime that carries a maximum penalty of only two years in prison." **Id.** at 1070. The **McDonough** Court rejected the defendant's argument:

> Because we do not view the registration requirements as punitive but, rather, remedial, **we do not perceive mandating compliance by offenders who have served their maximum term to be improper**. Furthermore, the fact that an offender may be held until such information is furnished is no different from confining someone in a civil contempt proceeding. While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if release is conditioned upon one's willingness to comply with a particular mandate.
>
> **Commonwealth v. Gaffney**, 557 Pa. 327, 733 A.2d 616, 622 (1999) (emphasis added) (citations omitted). Similarly, in [**Commonwealth v. Benner**, 853 A.2d 1068 (Pa. Super. 2004)], this Court also recognized that:
>
> The registration provisions of Megan's Law do not constitute criminal punishment. The registration requirement is properly characterized as a collateral consequence of the defendant's plea, as it cannot be considered to have a definite, immediate and largely automatic effect on a defendant's punishment.

> \*   \*   \*

> Because the registration requirements under Megan's Law impose only collateral consequences of the actual sentence, their application is not limited by the factors that control the imposition of sentence. Thus, while a defendant may be subject to conviction only under statutes in effect on the date of his acts, and sentence configuration under the guidelines in effect on that same date, the application of the registration requirements under Megan's Law is not so limited. This is so due to the collateral nature of the registration requirement.

> *Benner*, 853 A.2d at 1070–71.

> While *Gaffney* and *Benner* were decided prior to the effective date of SORNA, the same principles behind the registration requirements for sexual offenders under Megan's Law apply to those subject to SORNA. Namely, to effectuate, through remedial legislation, the non-punitive goal of public safety. *Gaffney*, 733 A.2d at 619; *see* 42 Pa.C.S. § 9791(a) (legislative findings and declaration of policy behind registration of sexual offenders). In fact, one of the main purposes behind SORNA is to fortify the registration provisions applicable to such offenders. See 42 Pa.C.S. § 9799.10 (purpose of registration of sexual offenders under SORNA); *see also* H.R. 75, 195th Gen. Assemb. Reg. Sess. (Pa. 2012). With this purpose in mind, we cannot find that the law is unconstitutional as it applies to McDonough.

*Id.* at 1071.

Instantly, SORNA's statutory language is unambiguous: unlawful restraint of a minor and false imprisonment of a minor are defined as Tier I sexual offenses. 42 Pa.C.S. § 9799.14(b)(1)-(2). Similarly, two or more Tier I convictions is included in the definition of a Tier III sexual offense. 42 Pa.C.S. § 9799.14(d)(16). SORNA did not include any language requiring a

sexual component for these offenses as a prerequisite for sexual offender registration. *See Braun*, 24 A.3d at 953. Because SORNA's language is unambiguous, we cannot resort to other considerations. *See id.* Accordingly, notwithstanding the absence of any sexual offenses against the minor victim, Appellant is not exempt from SORNA's mandatory lifetime registration requirement. *See id.* Because Appellant was convicted of two Tier I sexual offenses, he is considered to have committed a Tier III sexual offense, *see* 42 Pa.C.S. § 9799.14(d)(16), and thus, Appellant is required to register for his lifetime. *See* 42 Pa.C.S. §§ 9799.13, 9799.15(a). We have no discretion to disregard the plain, unambiguous language of SORNA.[22] *See Braun*, 24 A.3d at 953.

Similarly, we are bound by the *McDonough* Court's rationale, and hold that SORNA is not unconstitutional as applied to Appellant. *See McDonough*, 96 A.3d at 1071. SORNA's lifetime registration requirement for Appellant, which exceeds his sentence of imprisonment, is constitutional as applied to him. *See id.* To the extent Appellant raised a facial challenge, he waived it by failing to comply with Pa.R.A.P. 521. *See* Pa.R.A.P. 521; *Kepple*, 615 A.2d at 1303 (holding appellant waived facial constitutional challenge to statute by failing to notify attorney general under Rule 521). For all these reasons, we affirm Appellant's judgment of sentence.

---

[22] The legislature has deemed it appropriate to require registration for offenses that lack a sexual component.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/27/2016

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY,
PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,  : CRIMINAL ACTION

v.                             :

KEITH ARNOLD JOHNSON,          : NO. 1643 OF 2014

       Defendant/Appellant.        :

_____ : JUDGE JOSEPH M. GEORGE, JR.

ATTORNEYS AND LAW FIRMS

Jennifer M. Casini, Esquire, Assistant District Attorney, *For the Commonwealth*

Michael J. Garofalo, Esquire, Assistant Public Defender, *For the Appellant*

# OPINION

GEORGE, J.                                        September 25, 2015

Following a trial by jury, Appellant, Keith Arnold Johnson, was found guilty of three (3) counts of Aggravated Assault with a Deadly Weapon, three (3) counts of Kidnapping, three (3) counts of Unlawful Restraint-Risk of Bodily Injury, one (1) count of Unlawful Restraint of a Minor-Risk of Bodily Injury, three (3) counts of False Imprisonment, one (1) count of False Imprisonment of a Minor, three (3) counts of Robbery, two (2) counts of Burglary, two (2) counts of Criminal Trespass, two (2) counts of Theft by Unlawful Taking, one (1) count of Unauthorized Use of a Motor Vehicle, four (4) counts of Terroristic Threats, and one (1) count of Criminal Conspiracy. Appellant was sentenced to a term of imprisonment for a period of not less than twenty-eight (28) years nor more than fifty-six (56) years. Additionally,

1

Appellant was informed of his duty to register for life under Pennsylvania's Sexual Offender Registration and Notification Act (SORNA). Appellant filed a timely post-sentence motion and the Court denied same. He filed a direct appeal to the Superior Court of Pennsylvania. This Opinion is in support of the verdict of the jury.

## CONCISE ISSUES

Appellant filed the following Statement of Errors Complained of on Appeal:

1. DID THE COURT ERR IN DENYING ALL OF APPELLANT'S MOTIONS FOR MISTRIAL?

2. DID THE COURT ERR IN DENYING THE MOTIONS FOR JUDGMENT OF ACQUITTAL AS TO ALL CHARGES RELATED TO THE ALLEGED MINOR VICTIM AS THE VICTIM OF THOSE OFFENSES DID NOT TESTIFY IN VIOLATION OF APPELLANT'S RIGHT TO CONFRONT HIS ACCUSER?

3. DID THE COMMONWEALTH FAIL TO ESTABLISH THAT APPELLANT PARTICIPATED IN ANY OF THE OFFENSES AS THEY DID NOT PROVE APPELLANT'S PRESENCE AT THE SCENE OF THE INCIDENT OR CORROBORATE THAT HE RECEIVED ANY OF THE ITEMS TAKEN?

4. DID THE COURT ERR IN DENYING THE APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO KIDNAPPING CHARGES REGARDING RONALD AND JONATHAN PACKRONI IN THAT THEY WERE NEVER REMOVED FROM THE RESIDENCE OR KEPT IN ISOLATION?

5. DID THE COMMONWEALTH FAIL TO PROVE BEYOND A REASONABLE DOUBT THE APPELLANT CAUSED SERIOUS BODILY INJURY AS REQUIRED BY THE ELEMENTS OF AGGRAVATED ASSAULT?

6. DID THE COMMONWEALTH FAIL TO PROVE BEYOND A REASONABLE DOUBT THAT THE APPELLANT HAD ANY UNLAWFUL CONTACT WITH THE MINOR VICTIM SINCE THERE WAS NO PHYSICAL EVIDENCE PRESENTED IN THE INSTANT CASE?

7. IS IT UNCONSTITUTIONAL TO REQUIRE AN APPELLANT TO REGISTER FOR A LIFETIME WHEN SAID REGISTRATION REQUIREMENT EXCEEDS THE STATUTORY MAXIMUM PENALTY FOR APPELLANT'S OFFENSE?

2

8. IS THE ADAM WALSH STATUTE UNCONSTITUTIONAL IN REQUIRING THE APPELLANT TO REGISTER FOR A LIFETIME?

## FACTS

On January 13, 2014, Ronald Packroni and his brother Jonathan Packroni were at their residence at 613 North Water Street in Masontown, Fayette County, Pennsylvania. Jonathan had joint custody of his four-year-old son, Connor Packroni, who was also at the residence that day. Around 11:30 that evening, a friend of the Packroni brothers, Jonathan Byers, came over to the residence, where the three individuals watched a movie and smoked a joint of marijuana. (T.T. p. 86, 152-153). Connor was in his bedroom sleeping at the time.

Earlier that day, Ronald invited Misty Danko, the mother of his children to come over that evening. (T.T. pp. 18, 20-21, 227). Danko was in a sexual relationship with Ronald, but was also in a relationship with Appellant. (T.T. pp. 219-20). Appellant suggested to Danko that she should go to Ronald's house so Appellant would have access to the residence to steal any money or drugs. (T.T. pp. 222, 227). Later that evening, Danko and Appellant went to a bar to meet up with Bernard Richardson. Danko testified that she overheard Appellant and Richardson talking about getting a third person to go out to the Packroni residence. (T.T. pp. 228-29). After that, the three of them, along with a fourth individual, Broderick Harris drove to Ronald's house. (T.T. pp. 230-31).

Appellant drove Danko, Richardson, and Harris from Uniontown to Masontown, where they pulled up to an alley on the side of the Packroni residence.

3

Appellant, Richardson, and Harris exited the vehicle and went up to the Packroni house, with the intent to scope out the residence to see who was all present. (T.T. p. 232). They were gone for several minutes and returned to the vehicle. (T.T. p. 233). At that point, a discussion between the four took place, in which Danko was to go into the house and unlock the door so Appellant, Richardson, and Harris could enter the home. (T.T. pp. 233-34). After said discussion, the four of them went to Sheetz in Carmichaels, approximately five minutes from the Packroni house. (T.T. pp. 234, 304). Once they arrived at Sheetz, Appellant went into the store, while Danko, Richardson, and Harris remained in the vehicle. (T.T. p. 235). Appellant was in the store for about five minutes, got back into the vehicle, and they then drove back to the Packroni home. (T.T. p. 235). Danko dropped Appellant, Richardson, and Harris off on a street leading up to the Packroni residence. (T.T. p. 235). Danko then proceeded to the Packroni house and met Ronald at the door leading into the kitchen. (T.T. p. 236).

Ronald opened the door for Danko, closed and locked the door, and the two went back to Ronald's room to have sex. (T.T. pp. 22-23). At that time, Jonathan was in his bedroom while Byers was on the couch in the living room. (T.T. pp. 86, 154). At one point during the sexual encounter, Danko stopped and went into the kitchen to get a glass of water. (T.T. p. 23).

Danko got a glass of water and started to pace back and forth. (T.T. pp. 24-25). Ronald noticed the odd behavior by Danko and proceeded to the kitchen. (T.T. pp. 24-25). At the same time, Danko unlocked the kitchen door and three masked

4

men entered the residence. (T.T. pp. 25, 237-38). Ronald was met by a man, later identified as Appellant, who pointed a gun in his face. (T.T. pp. 25-27). Appellant was wearing a black hooded sweatshirt and a bandana that covered his face from his nose down. (T.T. p. 26). When Ronald was met by Appellant in the hallway, he was able to see his eyes and his forehead. (T.T. p. 26). Ronald was hit several times in the face with the gun and was herded into the living room. (T.T. p. 30). When he entered the living room, he noticed Byers was being beaten by the other two masked men, later identified as Broderick Harris and Bernard Richardson, with their guns and their fists. (T.T. pp. 31, 154-55). Ronald was ordered to get down on the floor, where he again was hit numerous times in the back of the head with the gun. (T.T. p. 30).

After Ronald was forced into the living room, Appellant went into Jonathan's bedroom and woke him up by gunpoint. (T.T. p. 89). Jonathan too was forced into the living room and was hit in the back of the head by a hard object and forced onto the ground. (T.T. pp. 92-93). At this point, all three victims were in the living room area, with Byers by the couch, and Ronald and Jonathan lying next to each other. (T.T. pp. 35, 96).

After Appellant and his co-conspirators gathered the adult victims into the living room, they started to ask for money and threatened to kill them and Connor if they did not comply with their demands. (T.T. pp. 35, 93-94, 173). Simultaneously, the adult victims were being kicked and struck with the guns possessed by the assailants. Appellant then searched Byers and took his wallet, which contained one

5

hundred and twenty dollars, a bank card, and took his keys and cell phone. (T.T. pp. 173-74).

After he searched Byers, Appellant let Byers go into the bathroom to clean up his face so Appellant could take Byers to an ATM machine to withdraw money. (T.T. pp. 37, 97, 174). Byers was escorted out of the Packroni residence by Appellant and Richardson. (T.T. pp. 175, 178). They drove off in Ronald's car to an ATM machine on Main Street in Masontown. (T.T. p. 176). Appellant drove the car and threatened Byers that if he did not get money from Byers, then someone was going to get shot. (T.T. pp. 176-177). Byers was seated in the front passenger seat, while Richardson was in the seat behind Byers with a gun pointed at his head. (T.T. pp. 176, 178). When they arrived at the ATM machine, Byers and Appellant exited the vehicle and went up to the ATM machine. (T.T. p. 178). Appellant stood to the right of Byers with a gun in his hand, gave him Byers' bank card, and ordered him to make a withdraw. (T.T. p. 179). After several attempts of trying to withdraw cash, Byers was unsuccessful, prompting Appellant to order Byers to get in the car where they went back to the Packroni house. (T.T. pp. 179-180, 182).

While Byers was escorted to the ATM machine, Harris and Danko stayed behind at the Packroni residence. (T.T. p. 98). Ronald and Jonathan were taken from the living room to the hallway next to their bedrooms, while Danko was ordered to search their bedrooms. (T.T. pp. 98-99).

When Byers arrived back at the house, he was forced to lie on his stomach and his hands were tied behind his back. (T.T. p. 184). Appellant and Harris pointed

6

their guns at Byers and demanded information about where they could get money. (T.T. pp. 184-85). Byers told them he had money at his house in a specific location.[1] (T.T. pp. 44, 185, 192, 245). Appellant took the house key from Byers and took Danko with him. (T.T. pp. 44, 185, 192).

When Appellant and Danko went to the Byers residence, Richardson and Harris were still at the Packroni home. By this time, all three victims were in the living room and tied up with cords from the telephone and the television. (T.T. pp. 101-02, 184). One co-conspirator continued to ransack the bedrooms. (T.T. p. 102). He eventually went into Connor's room and asked him "where's your daddy's money at." (T.T. pp. 42, 104). Connor was pulled away from his room and taken into Jonathan's room. (T.T. pp. 104, 186). After Jonathan pleaded repeatedly to leave Connor alone, Connor was put back in his room. (T.T. p. 104).

Once Appellant and Danko arrived at the Byers' house, they entered the basement area of the house. (T.T. p. 246). Danko took the money and handed it to Johnson. (T.T. p. 246). Appellant then ransacked the basement, took a watch, and left the premises. (T.T. p. 194-95, 247).

After that, Appellant and Danko drove back to the Packroni house and picked up Richardson and Harris. (T.T. pp. 48, 249-250). They then drove to the Tuskegee apartment complex in Uniontown. (T.T. p. 250). Once there, Appellant divided the money amongst the four of them. (T.T. pp. 251-53).

---

[1] Jonathan Byers resided with his parents at the time of this incident. His parents were home when Appellant and Danko broke into his house.

After Appellant, Richardson, Harris, and Danko left the Packroni house, the victims untied themselves, got Connor from his room, and went down to the neighbor's house. (T.T. pp. 109-110, 189-90). They called 9-1-1 and Officer Thomas O'Barto of the Masontown Police Department was dispatched and an ambulance was called. (T.T. pp. 325-326).

Officer O'Barto obtained a quick synopsis of what happened from the victims. (T.T. p. 326). He went to the Packroni house, secured the scene, and called for additional backup. (T.T. p. 326). Officer O'Barto then obtained video footage from the Sheetz in Carmichaels and the ATM video from the First National Bank on Main Street in Masontown for the morning hours of January 14, 2014. (T.T. p. 333). He also obtained photos from surveillance cameras at Uniontown Hospital on the day before the incident. (T.T. p. 333). The photos at Uniontown Hospital showed Danko with Appellant, who was wearing a black hooded sweatshirt with red lining. The video at the ATM showed Byers with a masked man who was also wearing a black hooded sweatshirt with red lining. (T.T. p. 345). His investigation led him to Danko and eventually to Appellant, Richardson, and Harris.

## DISCUSSION

I. **Appellant's motions for mistrial were denied as Appellant was not unfairly prejudiced in the eyes of the jury**

Appellant's first concise issue is whether the Court erred in denying all of Appellant's motions for mistrial.

> A motion for a mistrial is within the discretion of the trial court. [A] mistrial [upon motion of one of the parties] is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and

8

> impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, [the appellate court's] standard of review is whether the trial court abused that discretion. An abuse of discretion is more than an error in judgment. On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

*Commonwealth v. Tejeda*, 834 A.2d 619, 623 (Pa. Super. 2003) (citations omitted).

Appellant's first motion for a mistrial was made when Byers was testifying. During trial, the exchange between the prosecutor and Byers relevant to the subject of the motion was as follows:

Q: Did you [Mr. Byers] have the opportunity to ascertain who the other individual was who was hitting and kicking you along with Broderick Harris?

A: Yes.

Q: Can you tell us who that individual was?

A: Yes. It was Keith Johnson.

Q: And how are you aware it was Keith Johnson?

A: I know who Keith Johnson is.

Q: What type of clothing was Keith Johnson wearing?

A: He had a jacket on and a mask from the nose down and dark colored pants.

Q: Okay. And did Keith Johnson make any statements to you during this encounter?

A: Yes.

Q: And tell the members of the jury what statements that Keith Johnson made to you?

9

A: When I was down on the floor he knelt down beside me and held his gun in my face and said *do you remember this?*

T.T. pp. 159-160. (emphasis added).

Appellant objected, arguing that by Byers saying "do you remember this," it eluded to a prior incident, thus prejudicing Appellant in the eyes of the jury. The Court, outside the presence of the jury, conducted a brief colloquy with Byers about the meaning of the statement. The colloquy revealed Byers knew Appellant from a prior incident involving a firearm.

The Pennsylvania Superior court has stated that "every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial." *Commonwealth v. Marker*, 331 A.2d 883, 887 (Pa.Super. 1974). Byers' statement was at most a subtle reference to a prior incident involving Appellant. No direct statements regarding said incident was mentioned by Byers or the prosecutor. "[I]t is only those references that expressly or by reasonable implication also indicate some involvement in prior criminal activity that rise to the level of prejudicial error." *Commonwealth v. Young*, 578 Pa. 71, 77, 849 A.2d 1152, 1156 (2004).

In *Commonwealth v. Lark*, 462 A.2d 1329 (Pa. Super. 1983), the police recovered from Lark's residence a book that contained phone numbers. At trial, a detective testified that the book had been submitted to the F.B.I. Lark's counsel moved for a mistrial, arguing the reference to the F.B.I. indicated Lark had prior contact with law enforcement. Lark's motion was denied. Lark appealed and raised

10

as an issue that the trial court should have granted the motion for mistrial. The Superior Court agreed with the trial court, noting the "jury would have to indulge in gross speculation" to conclude Lark had engaged in prior criminal activity. *Lark*, 462 A.2d at 1337.

Likewise, the jury in this case would also have had to indulge in gross speculation to conclude Byers' testimony referred to a prior incident between Byers and Appellant. Byers did not inform the jurors on how he knew Appellant prior to this incident and it would be an unreasonable leap to conclude a prior bad act by Appellant. *See Commonwealth v. Zabala*, 449 A.2d 583 (Pa. Super. 1982) (detective's testimony that he knew defendant and where he lived because he arrested him was not prejudicial); *Commonwealth v. Starks*, 484 Pa. 399, 399 A.2d 353 (1979) (detective's testimony that he knew defendant's nickname from other contacts with defendant did not provide a reasonable implication of prior criminal activity by defendant). Thus, Appellant's first motion for mistrial was properly denied.

Appellant's second motion for mistrial came during Danko's testimony. When asked about the type of relationship she had with Appellant, Danko testified "it was an abusive relationship." (T.T. p. 223). Appellant objected and motioned for a mistrial, arguing the characterization of the relationship between Danko and Appellant testified to by Danko was done to prejudice Appellant in front of the jury. Although Appellant's motion for a mistrial was denied, this Court sustained Appellant's objection to the description of the relationship. Additionally, the jury was

provided with cautionary instructions, directing them to disregard Danko's portrayal of her relationship with Appellant.

As mentioned above, every unwise or irrelevant remark uttered by a witness does not compel the court to grant a mistrial. While there may have been some prejudice to Appellant, the comment by Danko did not rise to the level of prejudice required to grant a mistrial. Moreover, the jury was cautioned to disregard said comment. Since the presumption in our law is that the jury follows court instructions, cautionary instructions are adequate to overcome possible prejudice and a motion for mistrial is not warranted. *Commonwealth v. Fetter*, 770 A.2d 762 (Pa. Super. 2001) (although witness's statements that defendant was a "compulsive liar" and that "everything that comes out of his mouth isn't true," the court's cautionary instructions were adequate to cure and overcome any prejudice towards defendant). Therefore, Appellant's second motion for mistrial was denied.

Appellant's last motion for mistrial came when the prosecutor for the Commonwealth mentioned Appellant's incarceration status when questioning Danko. The relevant portion of Danko's testimony was as follows:

Q: And at some point were you incarcerated in regard to this incident?

A: Yes.

Q: And where were you initially incarcerated?

A: At the Fayette County Jail.

Q: At some point in time after your arrest and incarceration at the Fayette County Jail, are you aware of whether Keith Johnson became incarcerated in the Fayette County Jail?

12

A: Yes he was.

T.T. p. 260.

"[T]here is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." *Commonwealth v. Johnson*, 576 Pa. 23, 52, 838 A.2d 663, 680 (2003). Furthermore, brief mention of a defendant's incarceration will not unduly prejudice the defendant. *Commonwealth v. Horne*, 89 A.3d 277 (Pa. Super. 2014). Only a constant reminder of a defendant's incarceration status will rise to the level of a mistrial because the jury's judgment may be affected and ultimately prejudice the defendant. *Estelle v. Williams*, 425 U.S. 501 (1976).

In this case, there was only one question by the prosecutor regarding Appellant's incarceration status and an affirmative response by Danko. This exchange amounted to a passing reference which did not constitute a constant reminder of Appellant's status as an inmate at the Fayette County Jail. Like the other two motions for mistrial, this one was properly denied and thus Appellant's first concise issue is without merit.


II.   Appellant's Confrontation Clause rights were not violated since he cross-examined the witnesses against him

Appellant's second concise issue is whether the Court erred in denying his motions for judgment of acquittal as to all charges relating to the minor victim. Specifically, Appellant argues the charges related to the minor victim should have been dismissed because the minor victim did not testify at trial in violation of

13

Appellant's right to confront his accuser. The Confrontation Clause of the Sixth Amendment of the federal constitution and article 1, section 9 of the Pennsylvania Constitution affords a defendant on trial the right to confront the witnesses against him.

Although the minor victim did not testify at trial, the allegations against Appellant regarding the minor victim did not come from the minor victim. Rather, the allegations came from the other victims who all testified at trial their observations of what happened that night with respect to the minor victim. Appellant had the opportunity and did in fact cross-examine the other victims on their observations made during the course of the evening and what transpired with Appellant, his co-conspirators, and the minor victim. At that point, it was up to the jury to determine the weight and credibility of the testimony provided by the other victims. Finally, while one statement from the minor victim was introduced at trial, the statement did not allege any wrongdoing by Appellant towards the minor victim.[2] Therefore, Appellant's third concise issue is without merit.

### III. The Commonwealth provided sufficient evidence that Appellant was at the scene of the incident and received the stolen items

Appellant's next concise issue is whether the Commonwealth established sufficient evidence that Appellant was at the scene of the incident or received any of the items taken.

> The standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a

---

[2] The statement made by the minor victim introduced at trial was "[the minor victim] is going to hurt the bad guys that hurt his dad." (T.T. p. 113).

14

light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom is sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence.

The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. [In this context, Courts] do not assess credibility nor . . . assign weight to any of the testimony of record. Therefore, we will not disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa.Super. 2014).

Danko testified that Appellant was at the scene of the incident. At the time of this incident, Danko was dating Appellant and conspired with him to help him gain entry into the Packroni residence. While Danko was a co-defendant in this case, the jury was made aware of that fact and was instructed to proceed with caution when examining her testimony.

However, her testimony was supported by other evidence. Byers identified Appellant as one of the assailants who was kicking and hitting him. He testified he was aware one of the men was Appellant because he knew who Appellant was prior to this incident. Furthermore, both Packroni brothers testified that Appellant was the man that pointed a gun in their face and forced them into the living room area.[3]

---

[3] Both Packroni brothers testified that Appellant was wearing a bandana mask but only covered a portion of his face, from his nose down. Thus, they were able to see his eyes and forehead.

15

Jonathan Packroni also testified that during the police investigation, Officer O'Barto presented him with a list of pictures at the Masontown Police Department and he picked Appellant out as the man who woke him up at gun point.

The Commonwealth also provided physical evidence connecting Appellant to the Packroni residence that night. The jury was shown photo stills that showed Appellant and Danko at Uniontown Hospital the day before the incident, a video from an ATM machine of Byers and a masked man located on Main Street in Masontown, and a video of Appellant at a Sheetz gas station two miles from the Packroni residence around 3:10 a.m. on the day of the incident.

The photo stills from Uniontown Hospital depict Appellant wearing a black hooded sweatshirt with red lining inside the hooded part of the sweatshirt. The video from the ATM machine shows Byers and a man wearing what appears to be the same hooded sweatshirt that Appellant wore to Uniontown Hospital the day before. Of course that was up to the jury to determine whether it was the same hooded sweatshirt. However, it was a reasonable inference to make, specifically since Byers testified that Appellant forced him from the residence to the ATM machine to withdraw money. Finally, the video from Sheetz shows Appellant walking into the store around 3:10 a.m. on the morning of the incident. As Officer O'Barto testified, this video placed Appellant within two miles of the crime scene.

The direct evidence provided by Danko and the three adult victims along with the circumstantial evidence from the video and photos provided by the

16

Commonwealth is sufficient to establish Appellant was present at the scene of the incident.

The Commonwealth also provided sufficient evidence that Appellant took and received items taken from the Packroni and Byers residences. Appellant, along with Danko, entered the Byers residence on 333 Fairview Avenue in Masontown, without consent and took $50,000 in cash. Danko testified that she got the money in the house and gave it to the Appellant, who eventually divided the money and gave some of it to Danko, Richardson, and Harris. Byers too testified that Appellant searched him at the Packroni residence at took the money out of his wallet. Therefore, Appellant's third concise issue is without merit.

IV.   The Commonwealth proved Ronald and Jonathan Packroni were kept in isolation, thus satisfying the kidnapping charges against them

Appellant's next concise issue is whether the Court erred in denying Appellant's motion for judgment of acquittal as to the kidnapping charges relating to Ronald and Jonathan Packroni. "A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge. *Commonewalth v. Foster*, 33 A.3d 632, 635 (Pa. Super. 2011). Appellant was charged with two subsections of Kidnapping:

> **(a) Offense defined.**-- Except as provided in subsection (a.1), a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

17

> (2) to facilitate commission of any felony or flight
> thereafter.
>
> (3) to inflict bodily injury on or to terrorize the
> victim or another.

18 Pa. C.S. § 2901(a)(2),(3). Appellant specifically argues Ronald and Jonathan were never removed from the residence or kept in isolation.

The evidence provided at trial shows the Packroni brothers were unlawfully confined for a substantial period of time in a place of isolation. The fact that the incident took place in the living room of the Packroni residence does not automatically negate the "place of isolation" requirement. A person has been confined to a place of isolation when the victim has been isolated from the usual protections of society, regardless of geographic isolation. *Commonwealth v. Mease*, 516 A.2d 24, 26 (Pa. Super. 1986).

Here, both victims were taken to the living room area of their house and forced onto the ground. They were held at gunpoint and were repeatedly threatened. Moreover, their hands and feet were tied from cords ripped from the telephone and television. The incident occurred at their house, in the early morning hours, and without police knowledge, making discovery or rescue unlikely. *See In re T.G.*, 836 A.2d 1003 (Pa. Super. 2003) (one's own apartment in a city can be a "place of isolation" if detention is under circumstances which make discovery or rescue unlikely); *Commonwealth v. Jenkins*, 687 A.2d 836 (Pa. Super. 1996) (defendant's actions created a "place of isolation" within victim's home even though police arrived

18

approximately 20 minutes after incident began as no one was able to reach victims for five hours and the fate of the victims was exclusively within defendant's control).

Furthermore, while it is unclear the amount of time that elapsed during this incident, the exact duration is a factor in determining whether the incident lasted a substantial period of time. Other factors include the mental state of the victim and whether the restraint was criminally significant in that it increased the risk of harm to the victim. *Commonwealth v. Hughes*, 399 A.2d 694, 698 (Pa. Super. 1979); *Commonwealth v. Markman*, 591 Pa. 249, 273, 916 A.2d 586, 600 (2007). Since the Packroni brothers were confined for a substantial period in a place of isolation, Appellant's fourth concise issue is without merit.

## V. The Commonwealth sustained its burden in proving Appellant caused bodily injury required by the elements of Aggravated Assault with a Deadly Weapon

Appellant's next concise issue is whether the Commonwealth failed to prove beyond a reasonable doubt that Appellant caused serious bodily injury required by the elements of aggravated assault. Appellant was charged with three counts of Aggravated Assault with a Deadly Weapon. A person is guilty of this subsection of aggravated assault if he attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon. 18 Pa. C.S. § 2702(a)(4). Thus, the Commonwealth only had to prove Appellant caused *bodily injury.*

Based on the evidence provided at trial, in light most favorable to the Commonwealth, the Commonwealth proved beyond a reasonable doubt the charges of Aggravated Assault with a Deadly Weapon. Testimonial evidence was presented

19

that Appellant and his co-conspirators struck his victims in the head with a firearm,[4] resulting in blood loss and significant pain.[5] Moreover, Appellant took such action in order for the victims to comply with his demands, thus proving he acted intentionally. Since the Commonwealth proved beyond a reasonable doubt the elements of Aggravated Assault with a Deadly Weapon, then Appellant's fifth concise issue is without merit.

## VI. Appellant formed an agreement with his co-conspirators which made him criminally liable for the acts of his co-conspirators

Appellant's next concise issue is whether the Commonwealth failed to prove that Appellant had any unlawful contact with the minor victim since no physical evidence was presented in the case. With respect to the charges against the minor victim, Appellant was convicted of Unlawful Restraint of a Minor, False Imprisonment of a Minor, and Terroristic Threats.

The Commonwealth can prove beyond a reasonable doubt its case based solely on testimonial evidence. There is no requirement that the Commonwealth prove the elements of its case with respect to the charges against the minor victim with physical evidence.

Appellant is correct that the evidence is limited on whether Appellant came into contact with the minor victim. Testimonial evidence does show that one of the assailants woke the minor victim up from his bed, took him out of his room and into

---

[4] A firearm, whether loaded or not, is included in the definition of a deadly weapon. 18 Pa. C.S. § 2301.

[5] Bodily injury is defined as impairment of physical or substantial pain. 18 Pa. C.S. § 2301.

20

Jonathan's room, and asked him about a safe at the residence. The evidence shows that this occurred while Appellant and Danko went to the Byers residence to steal the $50,000 in cash that belonged to Byers.

Nevertheless, Appellant is still guilty of the offenses committed against the minor victim because of the law on criminal conspiracy in Pennsylvania.

> Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1016-17 (Pa. Super. 2002) (citations omitted).

An agreement was formed between Appellant, Richardson, Harris, and Danko. The agreement was that Danko would use her relationship with Ronald to enter the house, determine who was all in the house and where they were located, and let the other co-conspirators in the house. At that time, the agreement was that the co-conspirators, including Appellant, would enter the house with guns and masks on and steal money and drugs, if any, from the residence. During the incident, Appellant

21

and his co-conspirators used force and threats in order to get the victims to comply with their demands.

Even though Appellant did not come into contact with the minor victim, it was foreseeable and in furtherance of the conspiracy that one of the co-conspirators would use the minor victim as a way to get the victims to comply with their demands. The testimonial evidence provided at trial was enough to prove an agreement was made amongst Appellant and his co-conspirators and thus Appellant was responsible for the underlying offenses of Unlawful Restraint of a Minor and False Imprisonment of a Minor. Therefore, Appellant's sixth concise issue is without merit.

## VII. SORNA's requirements are not unconstitutional since they are not punitive in nature and merely a collateral consequence of Appellant's convictions

Appellant contends in his next concise issue that it is unconstitutional to require him to register for a period that exceeds the statutory maximum of the crime for which he was sentenced. Essentially, Appellant believes the registration requirements constitute punitive measures. The United States Supreme Court announced a two-prong test where the court must first inquire into whether the legislature's intent was to impose punishment, and, if not, whether the measures are nonetheless punitive in its effect. *Smith v. Doe*, 538 U.S. 84.

The first prong requires a look at the General Assembly's intent in its enactment of SORNA. Specifically, the General Assembly decided to strengthen the registration laws of sexual offenders.

> This Commonwealth's laws regarding registration of
> sexual offenders need to be strengthened. The Adam

22

Walsh Child Protection and Safety Act of 2006 provides a mechanism for the Commonwealth to increase its regulation of sexual offenders in a manner which is *nonpunitive* but offers an increased measure of protection to the citizens of this Commonwealth.

42 Pa. C.S. § 9799.11(a)(2) (emphasis added).

Furthermore, the General Assembly's declared policy states:

It is the policy of the Commonwealth to require the exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection and *shall not be construed as punitive*.

42 Pa. C.S. § 9799.11(b)(2) (emphasis added).

The statute states clearly that the purpose of the act is not to punish the offender, but to protect the general public. Moreover, the General Assembly referenced it twice, thus reinforcing its intent. We conclude the General Assembly's purpose of registration was not to impose punishment. *See Commonwealth v. McDonough*, 96 A.3d 1067 (Pa. Super. 2014); *Commonwealth v. Balchick*, 1720 WDA 2014.

The effect of SORNA is also nonpunitive. At the time of sentencing, Appellant was informed that as a result of convictions of Unlawful Restraint of a Minor and False Imprisonment of a Minor, he is a Tier III offender and required to register under SORNA for the remainder of his life.

Nevertheless, the registration requirements have no effect on an offender's term of imprisonment or the amount of fine imposed for the underlying offense. The

23

registration requirement is a "collateral consequence of the defendant's plea, as it cannot be considered to have a definite, immediate and largely automatic effect on a defendant's punishment." *Commonwealth v. Benner*, 853 A.2d 1068, 1070 (Pa. Super. 2004).

Furthermore, the Act's registration and notification requirements do not significantly restrain registrants, who remain free to live where they choose, come and go as they please, and seek whatever employment they may desire. *Commonwealth v. Maldonado*, 576 Pa. 101, 838 A.2d 710, 717 (2003); *Williams*, 574 Pa. at 506, 832 A.2d at 973. Since SORNA's registration requirements are nonpunitive in both intent and effect, then Appellant's seventh concise issue is without merit.

## VIII. The Adam Walsh Act is constitutional as its registration requirements are remedial in nature

Appellant's last concise issue is whether the Adam Walsh Act is unconstitutional in requiring Appellant to register as a lifetime offender. The General Assembly found that "[s]exual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa. C.S. § 9799.11(a)(4). To combat recidivism and protect the public, the legislature requires an offender to register for fifteen years, twenty-five years, or life, depending on the crime(s) committed. Appellant's convictions fell into the Tier III category, thus mandating him to register for life. Requiring him to meet those conditions is not excessive by the very nature that the registration requirements are not punitive.

24

Although the discrepancy between his sentencing term and his registration term may seem excessive, Pennsylvania Supreme Court has ruled, "[b]ecause we do not view the registration requirements as punitive but, rather, remedial, we do not perceive mandating compliance by offenders who have served their maximum term to be improper." *Commonwealth v. Gaffney*, 557 Pa 327, 733 A.2d 616, 622 (1999). Unless and until Appellant presents credible evidence to combat the General Assembly's purpose and legislative findings of SORNA, his obligation to register for life is constitutional. Therefore, we find Appellant's last concise issue without merit.

BY THE COURT:

ATTEST:

_____
JOSEPH M. GEORGE, JR., JUDGE

_____
CLERK OF COURTS

FILED

2015 SEP 25 PM 3 37

JANICE SNYDER
FAYETTE COUNTY
CLK OF COURTS

9-25-15    4/0 5
DIST/DATE

DEF_____
DA_____
PO_____
PD_____
WARD_____
SHER_____
GA_____
ATTY_____
CC_____
BKG.CTR_____
PRSLV.CRT_____

25